[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
September 17, 2003
**THOMAS  K. KAHN**
**CLERK**

No. 02-10218

————————————————

D. C. Docket No. 00-00888 CV-ORL-22B

DEBORAH GRAYDEN,
CHARLES JACKSON, et al.,

Plaintiffs-Appellees,

versus

MIKE RHODES, individually,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

**(September 17, 2003)**

Before BIRCH and COX, Circuit Judges, and GEORGE[*], District Judge.

COX, Circuit Judge:

————————————

[*]Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

This case comes to us on interlocutory appeal following the district court's rejection of a city code enforcement officer's claim of qualified immunity. In this appeal, we must determine whether the Due Process Clause of the Fourteenth Amendment is violated when a code enforcement officer condemns an apartment complex and evicts the tenants without providing the tenants with contemporaneous notice of their right to appeal the condemnation decision. If we conclude that such conduct violates the Due Process Clause, we must then determine whether the tenants' right to contemporaneous notice was established with such clarity at the time of eviction in this case that the chief of the City of Orlando's Code Enforcement Bureau is not entitled to qualified immunity.

## I. BACKGROUND & PROCEDURAL HISTORY

Beginning on March 7, 2000, city officials inspected all of the units of Lafayette Square, a residential apartment complex located in Orlando, Florida ("the City").[1] Based on these inspections, the City notified the owner of Lafayette Square that city code violations at the complex presented a serious and continuing danger to its occupants, and threatened to declare the building unfit for human occupancy if the

---

[1]    Our recitation of the facts is based primarily on the admitted facts contained in the parties' joint pretrial statement. To the extent that material facts are in dispute, we present these facts in the light most favorable to the plaintiffs, as we must when the issue of qualified immunity is raised in a summary judgment motion. *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 925-26 n.3 (11th Cir. 2000).

violations were not corrected.[2] The owner was informed that the City of Orlando Code Enforcement Board ("the Board"), an independent administrative body created under Florida law,[3] would conduct a hearing on July 12, 2000, to consider the conditions at Lafayette Square.

The code violations were not corrected. On June 29, two weeks before the scheduled Board hearing, city officials posted notices on each apartment door at Lafayette Square directing residents to vacate the property by 5:00 p.m. on June 30. They also posted a condemnation notice on the main doors of each building of the complex that declared the complex to be unsafe, directed residents to vacate the buildings, and informed them that they would be subject to possible arrest or prosecution if they did not vacate immediately. The condemnation decision was made by Mike Rhodes, the chief of the City's Code Enforcement Bureau, and he signed the condemnation notices. The notices did not inform the tenants of any right to a hearing to challenge the condemnation decision.

On June 30, Richard Cato, an attorney for Greater Orlando Area Legal Services, notified the city attorney that several tenants requested a hearing pursuant

---

[2]     The evidence suggests that Lafayette Square apartments were plagued by serious problems, including collapsed ceilings, major leaks, constant mold and mildew, water leakage from light fixtures, and roach and other insect infestations.

[3]     Fla. Stat. § 162.03. The Board has the authority to issue final orders having the force of law, *id.* § 162.08(5), and may adopt rules for the conduct of its hearings, *id.* § 162.08(1).

to Section 30A.11 of the Orlando City Code ("the City Code" or "the Code"). Under

that section,

> Any person affected by any notice which has been issued in connection
> with the enforcement of any provision of this Code or of any rule or
> regulation adopted pursuant thereto may request and shall be granted a
> hearing on the matter before the Code Enforcement Board pursuant to
> Chapter 5 of the City Code.

Orlando, Fla. City Code § 30A.11. Cato also indicated that the tenants would seek

an injunction if the City refused to stay its code enforcement activity.

The City continued its enforcement efforts, and on July 12 three former tenants

of Lafayette Square filed a complaint in federal district court. The complaint alleged

a 42 U.S.C. § 1983 procedural due process claim and a Fair Housing Act claim

against the City and against Rhodes in his individual capacity.[4] The tenants also filed

a motion for a temporary restraining order that would prohibit any further code

enforcement action regarding Lafayette Square until they had a meaningful

opportunity to challenge the condemnation decision.

On that same day, July 12, the Board conducted its previously-scheduled

hearing regarding the violations at Lafayette Square. A notice of this hearing had

been published in the Orlando Sentinel on July 2 and July 9. Cato and one of the

---

[4] The complaint also named the owner of Lafayette Square as a defendant, but he was voluntarily dismissed from this action.

plaintiffs attended and testified at the hearing.[5]  At the hearing, the Board ultimately concluded that Lafayette Square was in violation of the City Code.

At the July 12 hearing, Cato asked the Board to schedule a second hearing to allow the tenants to address the Board.  The Board agreed to do so, and scheduled a hearing for July 26.  Notice of this hearing was mailed to every tenant's last known address on July 19 or 20, although at least one tenant asserts that he never received the notice.  Notice was posted on the Lafayette Square property, and it also was published in the July 23 edition of the Orlando Sentinel.  Because a hearing had been scheduled for July 26, the district court denied the plaintiffs' motion for a temporary restraining order.

On July 26, the Board conducted the second hearing.  Cato attended the hearing and he was joined by five former tenants of Lafayette Square, two of whom testified.[6]  At the conclusion of the hearing, the Board decided to allow the decision rendered at the July 12 hearing (finding Lafayette Square to be in violation of the City Code) to stand.

---

[5]    A tenant who was later added as a plaintiff also attended the July 12 hearing but did not testify.

[6]    Only one of the tenants in attendance was among the group of three that filed the complaint.  The other four tenants at the hearing were added as plaintiffs, along with several other tenants, later in the proceedings.  *See infra* note 7.

Several months later, the complaint was amended to add several additional plaintiffs[7] and new claims. The amended complaint alleges two claims against Rhodes: a Fair Housing Act claim that has since been dismissed[8] and the § 1983 procedural due process claim that is the focus of this appeal. The complaint also alleges claims against the City and the Board,[9] but these claims are not implicated by Rhodes' interlocutory appeal on the issue of qualified immunity.

Rhodes filed a motion for summary judgment on the § 1983 procedural due process claim based on qualified immunity, and his motion was referred to a magistrate judge. The magistrate judge identified three possible procedural due

---

[7]     After the complaint was amended, the plaintiffs included Deborah Grayden, Charles Jackson, Magdaly Laurenceau, Mervil Celissa, Ducace Vilne, Vileine Previl, Carolyn Gude, John McIntosh, Patricia Robotham, Angela Latimer, Jamell Myers, Peter Williams, Carolyn Moore, Sandra Freeman, Veronica Gaines, Ladonna May, Tiffany May, Eileen Burwell, Thomas Jackson, Constance Lawrence and Salisa Manning. All of the plaintiffs were evicted from Lafayette Square when the complex was condemned.
        Moore was voluntarily dismissed from this action. During the course of litigation, plaintiffs' counsel withdrew from the representation of five plaintiffs (Laurenceau, Latimer, Myers, Manning, and Thomas Jackson). The claims of Laurenceau, Myers, Manning and Thomas Jackson have been dismissed for failure to prosecute. The remaining plaintiffs are represented by counsel with the exception of Latimer, who is pro se. Latimer did not file a brief in this appeal. They will be referred to collectively as "the plaintiffs."

[8]     This claim was voluntarily dismissed by the represented plaintiffs, and the district court dismissed Latimer's pro se Fair Housing Act claim.

[9]     The first count of the plaintiffs' amended complaint alleges a § 1983 procedural due process claims against the City as well as Rhodes. The second and third counts allege a § 1983 due process claim against the City based on its written policy and a § 1983 claim against the Board for its failure to provide a timely and meaningful hearing, respectively. (The district court ruled that the City's Code Enforcement Board is an autonomous entity subject to suit under § 1983.)

6

process violations alleged against Rhodes: (1) a violation of the plaintiffs' constitutional right to be timely notified of the initial code violations; (2) a violation of their constitutional right to due process at the time of eviction (pre-deprivation due process); and (3) a violation of their constitutional right to due process following eviction (post-deprivation due process). As to the first alleged violation, the magistrate judge concluded that the plaintiffs had not demonstrated that they had a clearly established right to notice of the initial code violations. The magistrate judge held that Rhodes was entitled to qualified immunity as to the second allegation as well, reasoning that a tenant is not entitled to pre-deprivation notice or a pre-deprivation hearing if exigent circumstances exist and finding that Rhodes' belief that exigent circumstances existed in this case was reasonable.

But the magistrate judge reached a different result with regard to the plaintiffs' post-deprivation due process claim. The judge found that when a pre-deprivation hearing cannot be conducted due to exigent circumstances, immediate post-deprivation notice is constitutionally required. Because Rhodes did not provide the tenants with *personal* notice of their right to seek review of the condemnation decision, the magistrate judge concluded that Rhodes was not entitled to qualified

immunity as to the plaintiffs' claim of inadequate post-deprivation notice.[10] The district court adopted the magistrate judge's report and recommendation, and Rhodes appeals.

## II. ISSUE ON APPEAL & STANDARD OF REVIEW

The only issue on appeal is whether Rhodes is entitled to qualified immunity as to the plaintiffs' post-deprivation due process claim. More specifically, the issue is whether Rhodes is entitled to qualified immunity as to the plaintiffs' claim of constitutionally-inadequate post-deprivation *notice*; the plaintiffs allege that the City and the Board, but not Rhodes, are responsible for the alleged failure to provide a meaningful hearing.[11]

---

[10]     In another part of the magistrate judge's report and recommendation, the judge concluded that the notices in the newspaper were both procedurally and substantively deficient. The judge also held that, with respect to the other types of notice provided (e.g., notice by mail, notice posted on the property), there was a genuine dispute as to the adequacy of these notices.

[11]     Admittedly, it is not entirely clear from the complaint whether the plaintiffs allege that Rhodes failed to provide them with a meaningful hearing. The allegations in Count One, the § 1983 procedural due process count, do not differentiate between the City and Rhodes for the purpose of specifying which party (or parties) is responsible for the alleged notice deficiency and which party (or parties) is responsible for the alleged hearing deficiency. However, the factual allegations regarding the denial of an opportunity to be heard focus almost exclusively on the Board, not Rhodes, as the responsible party.

The plaintiffs' response to Rhodes' motion for summary judgment resolves any ambiguity. On no fewer than nine occasions, the plaintiffs contend that Rhodes is not entitled to qualified immunity on their claims of constitutionally-inadequate notice without mentioning any allegations that Rhodes denied them a meaningful opportunity to be heard. In fact, the plaintiffs expressly state in their memorandum in opposition to Rhodes' motion that "[t]he Plaintiffs' claims against Rhodes stem from his failure to provide them constitutionally adequate notice of their right to seek a hearing on his condemnation order." (R.2-49 at 5.)

The plaintiffs reaffirm the scope of their claim against Rhodes in their appellate brief:

We review the district court's denial of qualified immunity de novo. *Lambert v. Fulton County, Ga.*, 253 F.3d 588, 596 (11th Cir. 2001). Because the issue of qualified immunity was raised in Rhodes' summary judgment motion, we view the facts in the light most favorable to the plaintiffs. *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 925-26 n.3 (11th Cir. 2000).

## III. DISCUSSION

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982), the Supreme Court observed that qualified immunity shields government officials who perform discretionary functions[12] from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights. *Id.* at 818, 102 S. Ct. at 2738. Five years later, in *Anderson v. Creighton*, 483 U.S. 635, 107 S. Ct. 3034 (1987), the Court clarified that "[t]he contours of the right must be sufficiently clear

---

"Plaintiffs' claim against Rhodes is for his failure to notify plaintiffs of their right to seek a hearing on the order to vacate their apartments." (Pls.' Br. at 16.) The plaintiffs frame the issues on appeal in terms of Rhodes' failure to provide adequate notice, (*id.* at 1), and they reaffirm later in the brief that "Plaintiffs' claim against Rhodes is that his failure to provide notice denied them adequate post-deprivation process." (*Id.* at 28.) Thus, even if the plaintiffs' complaint could be construed to plead a claim that Rhodes failed to provide a constitutionally-adequate hearing, we have no difficulty concluding, based on the proceedings in the district court and the briefs on appeal, that such a claim has been abandoned.

[12] "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 n.17 (1994). The district court found, and the parties do not dispute, that Rhodes was acting within his discretionary authority in this case.

that a reasonable official would understand that what he is doing violates that right."

*Id.* at 640, 107 S. Ct. at 3039. In sum, a government official is not entitled to qualified immunity if his or her conduct violated a clearly established statutory or constitutional right and if the contours of the right were defined with such clarity that a reasonable official would have understood, at the time, that the conduct at issue violated that right.

With these principles in mind, the Supreme Court formulated a two-step qualified immunity analysis in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), which we must follow. Under the *Saucier* approach, we first ask if the facts alleged, taken in the light most favorable to the plaintiffs, show that Rhodes' conduct violated the plaintiffs' Fourteenth Amendment due process rights. *Id.* at 201, 121 S. Ct. at 2156. Second, if we conclude that the plaintiffs' constitutional rights have been violated under the facts alleged, we must determine whether their rights were clearly established – that is, whether the state of the law at the time of eviction would have made clear to a reasonable city code enforcement officer that Rhodes' conduct was unlawful. *Id.* at 202, 121 S. Ct. at 2156. To determine whether a right is clearly established under the second step, we examine cases that articulate constitutional rules of general application as well as those cases that apply these general rules in circumstances similar to those encountered in this case. *See Vinyard v. Wilson*, 311

10

F.3d 1340, 1350-52 (11th Cir. 2002). In so doing, the Supreme Court has cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration, noting that the "salient question" is whether the state of the law gave the official "fair warning" that the alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, ___, 122 S. Ct. 2508, 2516 (2002).

We address the two *Saucier* inquiries in turn. In Part A, we evaluate the plaintiffs' procedural due process allegations in light of the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1976) and the standard for notice set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652 (1950), and conclude that the plaintiffs have alleged a violation of their right to constitutionally-adequate notice under the Fourteenth Amendment. In Part B, we examine the relevant caselaw at the time of eviction and conclude that a reasonable public official could have believed that § 30A.11 of the City Code provided constitutionally-adequate notice to the plaintiffs of their right to challenge the condemnation decision and thus that Rhodes did not violate a clearly established constitutional right.

A. *Do the plaintiffs allege facts that establish a constitutional violation?*

There can be no doubt that, at a minimum, the Due Process Clause requires notice and the opportunity to be heard incident to the deprivation of life, liberty or

11

property at the hands of the government. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 656-57 (1950). And it is equally clear that the government must provide the requisite notice and opportunity for a hearing "at a meaningful time and in a meaningful manner," although in "extraordinary situations" the provision of notice and a hearing may be postponed until after the deprivation has occurred. *Fuentes v. Shevin*, 407 U.S. 67, 80, 90, 92 S. Ct. 1983, 1994, 1999 (1972). If the government fails to comply with the dictates of the Due Process Clause, the aggrieved party can seek compensatory damages and equitable relief under 42 U.S.C. § 1983. *McKinney v. Pate*, 20 F.3d 1550, 1555, 1557 (11th Cir. 1994) (en banc).

In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process. *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994). In this case, the first two elements are not in dispute. The tenants enjoyed a constitutionally-protected property interest in their continued residency at Lafayette Square, and they were deprived of that interest. *See Greene v. Lindsey*, 456 U.S. 444, 450-51, 102 S. Ct. 1874, 1878 (1982) (concluding that continued residency in leasehold property is a "significant interest in property" subject to due process protection); *Ward v. Downtown Dev. Auth.*, 786 F.2d 1526, 1530, 1531 (11th Cir. 1986) (holding that

under Florida law, continued occupancy, even pursuant to a tenancy at will, is a protected property interest within the meaning of the Takings Clause and the Due Process Clause of the Fifth Amendment).  And none of the parties question the fact that Rhodes' conduct, as the chief of the City's Code Enforcement Bureau, constitutes "state action" for the purposes of § 1983 liability.

Because the plaintiffs have alleged that they were deprived of a constitutionally-protected property interest as a result of state action, due process is implicated and the question becomes what process is due.  *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600 (1972).  The Supreme Court has often noted that due process is a flexible concept that varies with the particular circumstances of each case, and to determine the requirements of due process in a particular situation, we must apply the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1976).  *See, e.g., Gilbert v. Homar*, 520 U.S. 924, 931-32, 117 S. Ct. 1807, 1812 (1997) (applying the *Mathews* test to determine what process is constitutionally due); *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S. Ct. 975, 984 (1990) (same); *United States v. Wattleton*, 296 F.3d 1184, 1198 (11th Cir. 2002) (same).  Under the *Mathews* test,

> identification of the specific dictates of due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous

13

deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S. Ct. at 903. We examine each of the *Mathews* factors to determine what process was due in this case.

### 1. The *Mathews* Factors

The tenants' primary interest is one of undeniably great magnitude: they seek to protect their interest in enjoying uninterrupted occupancy in their residence of choice. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54, 114 S. Ct. 492, 501 (1993) (concluding that the right to maintain control over one's home is "a private interest of historic and continuing importance"); *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 902 (2d Cir. 1992) (noting, under the *Mathews* test, that the interest in one's home "merits special constitutional protection"); *United States v. 141st Street Corp. by Hersh*, 911 F.2d 870, 875 (2d Cir. 1990) (observing that the home occupies a privileged place in the eyes of the law). One's home certainly ranks among the most cherished property interests that due process protects, and the uninterrupted enjoyment of its comforts and security is undoubtedly a significant private interest.

14

But inherent in the tenants' interest in their *uninterrupted* occupancy at Lafayette Square is another important concern: their interest in maintaining their residence, in the long term, at Lafayette Square. With less than thirty-six hours to vacate the complex, the tenants were forced to secure alternate housing on short notice. Several of them, unaware of their opportunity to challenge the condemnation order, acquiesced in the decision and made binding commitments (e.g., signed a lease) to reside elsewhere. By doing so, these tenants unknowingly chose to forgo the option of securing temporary housing while contesting the condemnation, and they forfeited, for all practical purposes, any opportunity to return in short order to Lafayette Square if the deprivation proved to be erroneous. Simply stated, the tenants' interest in maintaining their long-term residence at Lafayette Square translated into an interest in knowing, when the complex was condemned and before they made alternate long-term housing arrangements, that they could challenge the condemnation decision. Thus, we identify two private interests under the *Mathews* test: (1) the tenants' interest in uninterrupted occupancy at Lafayette Square; and (2) their interest in residing at Lafayette Square in the long term which, for all intents and purposes, amounts to an interest in being informed at the time of eviction that the condemnation order can be challenged.

Turning to the second *Mathews* factor, we conclude that the risk of erroneous deprivation in this case is relatively low. In the context of a condemnation and resulting eviction, an "erroneous deprivation" occurs when a code enforcement officer like Rhodes evicts tenants from a building that actually is fit for human occupancy. The City Code guides Rhodes in his efforts to monitor code compliance and to wield his condemnation power appropriately, and to evaluate the risk of erroneous deprivation in this case, we must identify the process that Rhodes must follow under the Code to effectuate an emergency eviction.

The City Code empowers Rhodes with a right of entry and inspection. Orlando, Fla. City Code § 30A.09. If Rhodes determines that a building is in violation of the Code, he must notify the person responsible for correcting the violations, in writing, of the violations and provide a schedule for completing improvements that would bring the building into compliance. *Id.* §§ 30A.10(1), (3), (4). If the violations are not corrected in the time and manner specified in the initial notice, the violations may be referred to the Board, which then conducts a hearing and may, if necessary, issue an order vacating the building. *Id.* §§ 5.06(5), (6); § 30A.10(7).[13]

---

[13] The property owner must be notified of, and may testify at, the Board hearing. Orlando, Fla. City Code §§ 5.04(5), 5.05(5). At the conclusion of the hearing, the Board must issue an administrative order affording proper relief, which may include levying a fine, commanding steps

But Rhodes need not rely on Board action to vacate a building. The City Code alerts property owners that "[m]ajor or cumulative minor violations which are deteriorating into hazardous or nuisance conditions may also be subject to proceedings under Article IV," *id.* § 30A.10(7), and pursuant to Article IV of the City Code, Rhodes has the authority – independent of the Code Enforcement Board – to require that buildings be vacated when nuisance conditions exist to the extent that vacating the building is necessary for public health, safety and welfare. *Id.* §§ 30A.38, 30A.42. In determining whether a building is unfit for human occupation and should be condemned under Article IV, *id.* § 30A.42, Rhodes can rely upon the Code's definition of a "nuisance," which includes:

> (3) Physical or unsanitary conditions or conditions so lacking illumination or ventilation as to be dangerous to human life or detrimental to health of persons on or near the premises where the condition exists.

> (4) Major or minor violations of this Code which cumulatively impact upon premises to the point whereby conditions endanger human life or substantially and detrimentally affect the safety or security of occupants, nearby occupants or passers-by.

> (5) Whatever renders air, food or drink unwholesome or detrimental to the health of human beings.

---

to bring the building into compliance, or securing, repairing, *vacating*, or demolishing the structure. *Id.* §§ 5.06(5), (6). The City Code permits an "aggrieved party" to appeal the Board's order to Circuit Court, *id.* § 5.08(1), but it is unclear whether the tenants of a condemned building would be "aggrieved parties" entitled to appeal such an order.

(6) Fire hazards.

*Id.* § 30A.12.

If Rhodes exercises his authority to condemn a building under Article IV, he must serve the property owner and tenants with a notice to vacate the structure (as he did in this case), *id.* § 30A.42(A), and the property owner and the tenants may request a hearing on the matter before the Board. *Id.* § 30A.11. If the tenants make such a request, a hearing "shall be granted," *id.*, but the parties disagree about whether the Board would have the authority at that hearing to overrule Rhodes' condemnation order. Additionally, it is unclear whether the Board would render a "final administrative order" at the conclusion of this hearing. If the Board did issue a final administrative order at the conclusion of such a hearing, an "aggrieved party" would have the right to appeal the Board's order to state circuit court, but it is not entirely clear whether the tenants would qualify as an "aggrieved party." *Id.* § 5.08(1).

Based on our review, we conclude that, at the very least, the standards and procedures for inspection and condemnation under the City Code provide some protection against the risk of erroneous deprivation. Furthermore, the Code's definition of "nuisance," while somewhat vague, can guide Rhodes as he employs his condemnation power. Accordingly, we conclude that the risk of erroneous

deprivation – i.e., the risk that Rhodes will vacate a building fit for habitation – is relatively low.

But this is not to suggest that a code enforcement officer like Rhodes could never be mistaken. Notwithstanding the procedures established under the City Code to protect tenants from an erroneous deprivation, we must also consider under the second prong of the *Mathews* test whether additional or different procedures would afford marginally better protection against the possibility of an erroneous deprivation. *See Dusenbery v. United States*, 534 U.S. 161, 167, 122 S. Ct. 694, 699 (2002) (referring to the second prong of the *Mathews* test as "a cost-benefit analysis of the risks of an erroneous deprivation versus the probable value of additional safeguards"). In essence, we must examine the extent to which a hearing that provides a forum for tenants to voice their concerns about a condemnation order could reduce the likelihood of an erroneous deprivation.

We conclude that such a hearing could afford marginally better protection against an erroneous deprivation, and the circumstances of this case illustrate the potential value of such a hearing. Several tenants argue that their individual units were habitable and, as a consequence, the entire Lafayette Square complex should not have been condemned. Rhodes acknowledged that city officials did not conduct a formal unit-by-unit inspection of the complex in June prior to the condemnation

decision, and a Code Enforcement Bureau employee testified that as of July 12, 2000, the Bureau had not been able to assess the structural damage at Lafayette Square. Moreover, a city official testified that some units at Lafayette Square were "in good condition" at the time of condemnation, which presented Rhodes with a "major dilemma." (Tr. of Board Hr'g of July 12, 2000, at 10.) And Rhodes conceded that if tenants had approached him at the time of eviction and claimed special circumstances, and "[i]f another inspection of their unit had been done and showed their unit to be in reasonably good shape," he might have considered allowing those tenants to remain in their units beyond the date of condemnation.[14] (Rhodes Dep. at 151.) These observations suggest that the risk of erroneous deprivation, even if low, is not so negligible as to be unworthy of consideration. And while we do not suggest that tenants necessarily have the expertise and experience to evaluate the extent to which the buildings in which they live are fit for human occupancy, we acknowledge that they are intimately familiar with their homes and may, in some circumstances, be able to provide information that will assist the City and its officials in evaluating a condemnation order. Therefore, although the risk of erroneous deprivation is

---

[14] Although Rhodes contradicts this testimony later in his deposition, we must view the facts in the light most favorable to the plaintiffs.

relatively low, there is at least some value in conducting a hearing at which tenants can challenge a condemnation order.

The third *Mathews* factor requires us to examine the City's interest. In this case, the City's interest is of the highest order: protecting the public from dangerous and potentially life-threatening living conditions. We need not belabor the obvious importance of this interest, which none of the parties question. But under the third prong of the *Mathews* test, we must also consider the fiscal and administrative burden that additional procedural safeguards would impose.

The additional fiscal and administrative cost of notice is negligible. To effectuate an eviction, a city must inform the tenants of a condemned building that they have until a specified day and time to vacate. In the city of Orlando, this must be done in two ways: (1) by delivering a notice to vacate to the occupants of a condemned building personally, by leaving the notice at the occupants' place of abode, or by delivering the letter to the occupants' last known address; and (2) by placarding the building as unfit for human occupancy in a conspicuous place. Orlando, Fla. City Code § 30A.42(B). To include a one-sentence statement of a tenant's right to appeal the condemnation order in this notice to vacate would not be burdensome. In fact, Rhodes testified that the City amended its standard eviction notice to include a statement regarding the tenants' right to appeal the condemnation

21

order, which suggests that the fiscal and administrative burden of such notice is not prohibitive. Accordingly, we note that while the City's interest in protecting the public is exceptional, the City would assume almost no additional financial or administrative burden by providing notice of the right to a hearing at the same time it provides the notice to vacate.

The burden of conducting a hearing, of course, is likely greater than the cost of adding another sentence to the City's standard notice-to-vacate form. But this cost is hardly daunting, and there is no doubt in our minds that the tenants are entitled to a meaningful hearing at some point in time to contest the condemnation decision. The fiscal and administrative burden of conducting a *pre-deprivation* hearing, however, could be more pronounced, particularly if the hearing must be convened on short notice independent of any regularly-scheduled meeting.

> 2. Results of the *Mathews* Balancing: What Process is Due?

Having identified the *Mathews* factors, we now must balance these factors to determine the process that was due to the tenants of Lafayette Square. As a general rule, an eviction must be preceded by notice and an opportunity to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 81-82, 92 S. Ct. 1983, 1994-95 (1972); *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) ("Due process generally requires notice and a hearing prior to eviction."). But there are "extraordinary situations" in which some valid

governmental interest is at stake that justifies postponing the hearing until after the deprivation. *Fuentes*, 407 U.S. at 90, 92 S. Ct. at 1999. The Supreme Court has recognized that such extraordinary situations, which we will refer to as "exigent circumstances," are marked by three characteristics: (1) the seizure of property is necessary to secure an important governmental or general public interest; (2) there is a special need for prompt action; and (3) the person initiating the seizure is a government official responsible for determining, under the standards of a narrowly drawn statute, that the seizure was necessary and justified in the particular instance. *Id.* at 91, 92 S. Ct. at 2000.

We conclude, as have many other courts, that the emergency evacuation of tenants from a dangerous and potentially life-threatening structure qualifies as an "extraordinary situation." As a consequence, when such exigent circumstances exist, tenants can be evicted from a building reasonably judged to be unfit for human occupancy without a pre-deprivation hearing.[15] *See, e.g., Flatford v. City of Monroe*, 17 F.3d 162, 167, 168 (6th Cir. 1994) ("Protecting citizens from an immediate risk of serious bodily harm falls squarely within those 'extraordinary situations' . . . . [W]here the need to protect lives is the basis for [an emergency eviction], government

---

[15] For the purposes of this appeal, we assume that exigent circumstances existed because the district court, in adopting the magistrate judge's report and recommendation, concluded that Rhodes' belief that there were exigent circumstances was reasonable.

officials should not be made to hesitate in performing their duties, particularly where postdeprivation remedies can immediately correct any errors in judgment."); *Richmond Tenants Org., Inc., v. Kemp*, 956 F.2d 1300, 1307 (4th Cir. 1992) (holding, in a federal public housing case, that "in the absence of exigent circumstances, the Due Process Clause of the Fifth Amendment requires the government to provide for notice and an opportunity to be heard before a tenant may be evicted"). When the immediate safety of tenants is placed in jeopardy by hazardous and possibly life-threatening living conditions, a city's interest in protecting its citizens outweighs the tenants' interest in enjoying *uninterrupted* occupancy at their residence of choice.[16]

But exigent circumstances do not justify the postponement of notice until after the eviction. In this regard, the tenants' interest in being informed immediately of their right to challenge the condemnation decision outweighs any countervailing government interest. Without the benefit of pre-deprivation notice, tenants may acquiesce in the condemnation decision and secure alternate long-term housing even though they might prefer to remain temporarily in "housing limbo" and secure short-

---

[16] We base our conclusion primarily on the weighing of a city's interest in protecting the public against the tenants' interest in uninterrupted occupancy. However, the fiscal and administrative burdens associated with a pre-deprivation hearing reinforce our conclusion. If a pre-deprivation hearing were required before a city could complete an emergency evacuation, the city would undoubtedly wish to convene that hearing promptly to ensure that the dangerous structure could be vacated as quickly as possible. There is no doubt that the fiscal and administrative burdens attendant to such an urgent, previously-unscheduled hearing could be significant.

term housing while contesting the condemnation decision. If the deprivation proves to be erroneous – i.e., the building is habitable, and thus should not have been condemned despite the existing code violations – these tenants would have no recourse because of their binding commitment to take up residence elsewhere. And while pre-deprivation notice would serve the tenants' interest, it would not hinder any identifiable government interest. Providing such notice does not obstruct the City's legitimate interest in protecting the public from inhabiting dangerous buildings because the tenants are still required to vacate the premises, and pre-deprivation notice could be provided, as we note above, at little extra cost.

When exigent circumstances prompt an emergency eviction, contemporaneous pre-deprivation notice is required but a pre-deprivation hearing is not. By "contemporaneous," we mean that the tenants must receive notice of their right to challenge the condemnation decision when they are provided with the notice to vacate the building. We further hold that a post-deprivation hearing is not automatically required because evicted tenants may acquiesce in a condemnation decision, but if the tenants do exercise their right to challenge a condemnation order, a meaningful post-deprivation hearing should be conducted promptly. *Flatford*, 17 F.3d at 169. We have no occasion to articulate in any greater detail the requirements of a post-deprivation hearing because the plaintiffs only allege that Rhodes failed to provide

them with constitutionally-adequate notice and, as a result, the constitutional

adequacy of a post-deprivation hearing is not before us. *See supra* note 11.

3.      Did Statutory Notice Satisfy the Contemporaneous Notice Requirement in This Case?

Having concluded that the tenants were entitled to contemporaneous notice of

their right to seek review of Rhodes' condemnation decision, we must now consider

what type of notice is required to meet this due process requirement.[17]  Rhodes

concedes that he did not provide the tenants with personal notice prior to the eviction

deadline of their right to a hearing; city officials did not tell the tenants in-person of

their right to challenge the condemnation order, nor were they informed of this right

in the notice-to-vacate forms posted on their doors or on the placard displayed at the

main entrances to the complex.[18]  But Rhodes points out that the Orlando City Code

---

[17]      Notice comes in many shapes and sizes, and the events surrounding this case illustrate the various types of notice that can be employed.  Notice may be personal, including a conversation (either in-person or by telephone), a letter delivered by mail, or by posting or delivery at one's place of abode.  Notice may also be more general; it can be published in a newspaper, posted on the property, or provided in a state statute or city code. *See Dusenbery v. United States*, 534 U.S. 161, 176, 122 S. Ct. 694, 704 (2002) (describing various types of notice).

[18]      Rhodes contends that notice of the post-deprivation hearings was provided after the eviction.  He argues that publication notice of these scheduled hearings was provided as early as July 2, notice by mail was provided as early as July 19, and posted notice was provided on the Lafayette Square property prior to the July 26 hearing.  Obviously, these forms of notice were provided after the eviction, and thus do not satisfy the requirement of contemporaneous notice.

Rhodes vigorously contends that these post-deprivation notices "cured" the original notice deficiency.  Citing *McKinney v. Pate*, 20 F.3d 1550 (1994) (en banc), he argues that a state may cure a procedural deprivation by providing a later procedural remedy. *Id.* at 1557.  He contends that the provision of a post-deprivation hearing cured any possible injury that resulted from the failure to

26

informed the tenants, as "person[s] affected by any notice which has been issued in connection with the enforcement of any provision of this Code," of their right to request a hearing "on the matter" before the Board. Orlando, Fla. City Code § 30A.11. His argument has force because several Lafayette Square tenants exercised their right to a hearing under § 30A.11 on June 30, before the eviction deadline, when their counsel sent a letter to the city attorney invoking their right to a hearing. We must decide whether the statutory notice of the right to a hearing provided by § 30A.11 of the City Code is sufficient to satisfy the contemporaneous notice requirement that we have derived from our application of the *Mathews* balancing test.

For one hundred years, the Supreme Court has declared that a publicly available statute may be sufficient to provide such notice because individuals are presumptively charged with knowledge of such a statute. *Reetz v. Michigan*, 188 U.S. 505, 509, 23 S. Ct. 390, 392 (1903); *North Laramie Land Co. v. Hoffman*, 268 U.S. 276, 283, 45 S. Ct. 491, 494 (1925) ("All persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them . . . .");

---

provide constitutionally-adequate process prior to the eviction. We disagree. As we noted in detail earlier, the failure to provide pre-deprivation notice of the right to a hearing can work a uniquely final deprivation because evicted tenants may enter into binding, long-term commitments to reside elsewhere. Providing post-deprivation notice and a post-deprivation hearing cannot cure the pre-deprivation due process violation in such a circumstance. Accordingly, even if Rhodes provided adequate post-deprivation notice and the Board provided a meaningful post-deprivation hearing (two hotly disputed issues), this process is not "sufficient to remedy the procedural deprivation." *Id.*

*Texaco, Inc. v. Short*, 454 U.S. 516, 532, 102 S. Ct. 781, 793 (1982) ("It is well established that persons owning property within a State are charged with knowledge of relevant statutory provisions affecting the control or disposition of such property."). This principle of statutory notice was announced with the greatest force in *Atkins v. Parker*, 472 U.S. 115, 105 S. Ct. 2520 (1985), when the Court wrote, "All citizens are presumptively charged with knowledge of the law . . . . The entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny." *Id.* at 130-31, 105 S. Ct. at 2529-30.[19]

As early as 1905, the Supreme Court applied the principle of statutory notice to charge a plaintiff with notice of the right to an opportunity to be heard regarding a deprivation. In *Reetz v. Michigan*, the plaintiff had been convicted for violating a

---

[19]     It is true that in many of the Supreme Court cases just cited, the question was not whether the statute at issue provided citizens with adequate notice of their right *to challenge* a deprivation; rather, the question was whether the statute provided adequate notice *of the potential deprivation itself*. *See Texaco*, 454 U.S. at 531, 102 S. Ct. at 793 (whether Indiana's Mineral Lapse Act adequately notified affected individuals of the actions that must be taken to avoid the extinguishment of mineral rights); *Atkins*, 472 U.S. at 129-30, 105 S. Ct. at 2529 (whether a statutory amendment to the Food Stamp Act provided sufficient notice to food-stamp households of an adjustment of benefit levels); *United States v. Locke*, 471 U.S. 84, 108, 105 S. Ct. 1785, 1799-1800 (1985) (whether the Federal Land Policy and Management Act of 1976 adequately notified claimants of the recording actions that must be taken to avoid the abandonment of a mining claim). Unlike those cases, the tenants in this case were quite aware that they were being deprived of their property but they were not informed by the City of their right to appeal the deprivation. This distinction makes no difference, however, because as we note in the following paragraphs, the Court has also held that a statute can provide notice of the right to an opportunity to be heard.

28

Michigan statute that prohibited unregistered individuals from practicing medicine. 188 U.S. at 505-06, 23 S. Ct. at 391. Under Michigan law, a board of registration issued certificates of registration to practice medicine. To obtain a certificate, the plaintiff sent to the board copies of his registration under the prior statute and his diploma from a medical college, but the board denied his application. The plaintiff filed suit, contending that the Michigan statute did not provide him with notice, a hearing, or the power to summon witnesses and compel their testimony before the board. The Court rejected the plaintiff's claim because the state statute provided for semiannual meetings of the board at specified times, the plaintiff did not appear at these meetings to present his application, and if the plaintiff had attended a meeting and applied for a hearing, the board would have been compelled to grant it. Accordingly, the Court declared that "[w]hen a statute fixes the time and place of meeting of any board or tribunal, no special notice to parties interested is required. The statute is itself sufficient notice." *Id.* at 509, 23 S. Ct. at 392.

Just four years ago, in *City of West Covina v. Perkins*, 525 U.S. 234, 119 S. Ct. 678 (1999), the Supreme Court revisited the issue of statutory notice and reaffirmed its conviction that statutes can provide notice of an opportunity to be heard. In that case, police officers seized the plaintiffs' personal property, including photos, an address book, a shotgun, a starter pistol, ammunition, and over $2,600 in cash,

29

pursuant to a valid search warrant. The warrant related to another individual, a subject in a homicide investigation, who had been a boarder in the plaintiffs' home. The officers left a notice of the search and an itemized list of the property seized. The plaintiffs' attempts to recover the items by contacting the police department and by attempting to obtain a court order were unsuccessful, and they filed suit against the city of West Covina, arguing that the city failed to provide them notice of the remedies available under state law to obtain the seized property.

The Supreme Court rejected their claim because California law provided adequate remedies for the return of the plaintiffs' property, including motions brought under two sections of the California Penal Code. The Court concluded that the police officers were required to provide notice that they had seized the property, because without such notice, property owners could not ascertain who was responsible for their loss. But after the property owners were informed that the police had seized their property, the California statutes placed the property owners on notice of their right to file a motion in court to obtain the release of their property. The Court stated:

> No . . . rationale justifies requiring individualized notice of state-law remedies which . . . are established by published, generally available state statutes and case law. Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him. The City need not take other steps to inform him of his options.

*Id.* at 241, 119 S. Ct. at 681-82. Thus, the Supreme Court's view of statutory notice, reflected in its decisions from *Reetz* to *West Covina*, provides the basis for a compelling argument that § 30A.11 of the Orlando City Code, standing alone, provides contemporaneous notice to the tenants of their right to challenge the condemnation order and thus satisfies due process.

But the plaintiffs contend that the Supreme Court's decision in *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 S. Ct. 1554 (1978), placed an affirmative obligation on Rhodes to advise the tenants of the availability of a procedure for protesting the condemnation order. In *Memphis Light*, the plaintiffs erroneously believed that their municipal utility was "double billing" them for its services, and the plaintiffs' utility service was terminated on several occasions for nonpayment as a result of this misunderstanding. They sought in good faith to resolve the "double billing" problem, but the procedure for obtaining an opportunity to speak with the utility's management was not adequately explained, nor did the plaintiffs receive an adequate explanation for the possible duplicate charges. They filed suit against the utility, alleging that the utility failed to provide them with an adequate opportunity to be heard before their utility service was terminated.

The Supreme Court agreed with the plaintiffs. The Court concluded that the utility's notification procedure, while adequate to notify the plaintiffs of the threat of

termination of service, was not adequate to inform them of the availability of a procedure to object to their utility bills. The Court held that "[n]otice in a case of this kind does not comport with constitutional requirements when it does not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified." *Memphis Light*, 436 U.S. at 14-15, 98 S. Ct. at 1563. In a footnote, the Court observed that due process is flexible and identified two factors on which it appeared to base its decision, at least in part: the utility's notice of termination of services was "given to thousands of customers of various levels of education, experience, and resources," and the uninterrupted continuity of electric service is essential to health and safety. *Id.* at 15 n.15, 98 S. Ct. at 1563 n.15.

The tenants vigorously contend that *Memphis Light* controls this case and dictates that Rhodes had an affirmative obligation to advise them of their right to challenge the condemnation and the procedure for doing so. They argue that the City's notice to vacate was adequate to notify them of the pending eviction but was not adequate to inform them of their right to a hearing. Moreover, they note that the two factors upon which the *Memphis Light* Court arguably relied – the education and experience of those people affected by the deprivation and the fact that the property interest at issue is essential for health and safety – are present in this case.

We reject the plaintiffs' reliance on *Memphis Light.* One could arguably read footnote 15 of *Memphis Light* to hold that notice of the right to and procedure for requesting a hearing, which goes above and beyond the "skeletal notice" that informs individuals of the deprivation itself, is required when uneducated or inexperienced people are deprived of a property interest essential to health and safety. But after the Supreme Court's decision in *West Covina*, it is clear that these factors (the sophistication of the affected individuals and the health and safety implications of the deprivation), standing alone, are not sufficient to impose an affirmative obligation on city officials. In *West Covina*, the Court made clear that the affirmative obligation imposed in *Memphis Light* was predicated upon the fact that there were no publicly available sources that would provide notice to those utility customers who, upon learning of the threatened termination of their utility services, wished to contest it:

> In requiring notice of the administrative procedures [for resolving a billing dispute with the utility company], however, we relied not on any general principle that the government must provide notice of the procedures for protecting one's property interests but on the fact that the administrative procedures at issue were not described in any publicly available document. A customer who was informed that the utility planned to terminate his service could not reasonably be expected to educate himself about the procedures available to protect his interests . . . . While *Memphis Light* demonstrates that notice of the procedures for protecting one's property interests may be required when those procedures are arcane and are not set forth in documents accessible to the public, it does not support a general rule that notice of remedies and procedures is required.

33

*West Covina*, 525 U.S. at 242, 119 S. Ct. at 682. In reaching this conclusion, the Court acknowledged that notice of the right to a hearing can be provided by "published, generally available state statutes and case law," "public sources," "any publicly available document," and "documents accessible to the public." *Id.* at 241, 242, 119 S. Ct. at 681, 682. The tenants in this case, unlike the utility customers in *Memphis Light*, could have turned to § 30A.11 of the Orlando City Code to learn of their right to a hearing and the method for exercising this right. On this basis, we conclude that *Memphis Light* is distinguishable from this case and does not impose an affirmative obligation on Rhodes to advise the tenants of the availability of a procedure to challenge the condemnation.

Although we conclude that *Memphis Light* does not impose an affirmative notice obligation on Rhodes, we nonetheless conclude that such affirmative notice is mandated by due process. In reaching this decision, we rely on the standard for notice established by the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652 (1950), as well as our practical understanding of statutory notice. We acknowledge that this decision may, at first glance, appear to conflict with the Supreme Court's reasoning in *West Covina*, but we explain below why we believe that statutory notice was insufficient, given the circumstances of this case, to satisfy due process.

34

The *Mathews* balancing test, which we employ to determine the "dictates of due process," helps us determine at what point in time notice of the opportunity to be heard is constitutionally required. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976). In this case, based on our balancing of the *Mathews* factors, we concluded that the tenants were entitled to contemporaneous notice. But when we are called on to consider what type of notice is adequate to meet the contemporaneous notice requirement, we eschew the balancing test in *Mathews* and adopt a "more straightforward" approach. *Dusenbery v. United States*, 534 U.S. 161, 167, 122 S. Ct. 694, 699 (2002). The Supreme Court, when asked in a recent case to apply the *Mathews* test to evaluate the adequacy of a particular method of providing notice, declined to apply *Mathews* and indicated that the standard announced in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652 (1950), provides the proper analytical framework:

> [W]e have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims. Since *Mullane* was decided, we have regularly turned to it when confronted with questions regarding the adequacy of the method used to give notice. . . . We see no reason to depart from this well-settled practice.

*Dusenbery*, 534 U.S. at 168, 122 S. Ct. at 699-700 (citing seven Supreme Court cases dating back almost fifty years that have applied the *Mullane* standard to assess the adequacy of a particular method of providing notice). Based on the Supreme Court's

35

guidance, we apply the *Mullane* standard to evaluate the adequacy of statutory notice in this case.

Under the *Mullane* standard, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 393 U.S. at 314, 70 S. Ct. at 657. "Th[e] right to be heard has little reality or worth unless one . . . can choose for himself whether to appear or default, acquiesce or contest." *Id.*; *see also West Covina*, 525 U.S. at 240, 119 S. Ct. at 681 (citing *Mullane* for this proposition). In determining whether the Orlando City Code apprised the tenants of their right to choose whether to "acquiesce or contest," we reiterate that, for all practical purposes, the tenants lose their ability to meaningfully contest the condemnation order when they make alternate housing commitments. Therefore, for a notice to be reasonably calculated to apprise them of their choices, as *Mullane* requires, the notice must be reasonably calculated to apprise them of this right before they make alternate long-term housing arrangements. Moreover, we assume that if the tenants are unaware of their right to challenge the condemnation decision, there is a substantial likelihood that they will make such alternate plans before the deadline to vacate the premises, which, in this case, was 5:00 p.m. on June 30. Thus, under the *Mullane* standard, we must ask whether § 30A.11 of the Orlando City Code was reasonably calculated,

36

under all of the circumstances of this case, to provide the tenants with notice of their right to seek review of Rhodes' decision before the eviction deadline arrived at 5:00 p.m. on June 30.

We conclude that § 30A.11 of the Code, standing alone, is not reasonably calculated to apprise the tenants of their right to choose to acquiesce or contest the condemnation order. The *Mullane* standard requires us to consider "all the circumstances," 339 U.S. at 314, 70 S. Ct. at 657, and we find one aspect of this case to be extremely important: the residents of Lafayette Square were provided with no more than thirty-six hours to vacate their homes, and during this limited period of time, they had to complete a multitude of tasks, which ranged from securing alternate shelter to collecting their personal belongings to making accommodations for work or school. Although the Orlando City Code is a publicly available document and the law presumptively charged the evicted tenants of Lafayette Square with knowledge of its provisions, the law does not presume that the tenants *actually knew* of their right to challenge the condemnation when they received the notice to vacate on June 29 and 30. The law does not entertain the legal fiction that every individual has achieved a state of legal omniscience; in other words, there is no presumption that all of the citizens actually know all of the law all of the time. Practically speaking, citizens must educate themselves about the law before they can wield the rights

37

dedicated to them under it, and the Supreme Court's approach to statutory notice takes account of this reality. *See West Covina*, 525 U.S. at 241, 119 S. Ct. at 682 (noting that an individual "can turn to these public sources to learn about the remedial procedures available to him"); *id.* at 242, 119 S. Ct. at 682 (noting that a citizen "could not reasonably be expected to educate himself about the procedures available to protect his interests"); *United States v. Locke*, 471 U.S. 84, 108, 105 S. Ct. 1785, 1799-1800 (1985) (noting that citizens need "a reasonable opportunity . . . to familiarize themselves with the general requirements imposed" by a new law); *Atkins v. Parker*, 472 U.S. 115, 130, 105 S. Ct. 2520, 2529 (1985) (noting that the presumption that all citizens are charged with knowledge of the law arguably may be overcome in cases in which the statute "does not allow a sufficient 'grace period' to provide the persons affected by a change in the law with an adequate opportunity to become familiar with their obligations under it"); *Texaco, Inc. v. Short*, 454 U.S. 516, 532, 102 S. Ct. 781, 793 (1982) ("Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply."). We conclude, in the circumstances of this case, that § 30A.11 of the Orlando City Code was not reasonably calculated to inform the tenants of Lafayette Square, who faced the burdens associated with an

eviction and had less than thirty-six hours to vacate their homes, of their right to choose between acquiescing in or contesting Rhodes' condemnation order.

*West Covina* does not compel us to conclude that § 30A.11 provides constitutionally-adequate notice, for several reasons. First, while *West Covina* repudiates a general rule that the government always must provide affirmative notice of the right to and procedures for requesting a hearing, *West Covina* does not stand for the converse proposition that statutory notice is always sufficient to satisfy due process. *See* 525 U.S. at 242, 119 S. Ct. at 682. Second, the holding in *West Covina* was framed in terms of the specific deprivation at issue in that case, namely, the deprivation of personal property by the police for a criminal investigation. *Id.* at 240, 119 S. Ct. at 681 ("When the police seize property for a criminal investigation, however, due process does not require them to provide the owner with notice of state-law remedies."); *see also id.* at 242-43, 119 S. Ct. 682-83 (basing its conclusion in part on the fact that neither the federal government nor any state has traditionally required law enforcement agencies to provide notice of state-law remedies). Third, it does not appear that the issue in our case (whether a public source provides constitutionally-adequate notice when citizens have less than thirty-six hours, amidst a sea of other obligations, to consult that source and learn of their rights) was presented in *West Covina*; there is no indication in that opinion that the plaintiffs

39

would have forfeited their right to obtain the seized property if thye did not learn of and exercise their right within a substantially-limited period of time. Fourth, the holding in *West Covina* seems to implicitly support our conclusion. The Court's opinion, which holds that personal notice of procedures may be required if a description of those procedures cannot be accessed by the public, acknowledges a practical concern about the public's ability to learn of its rights, and it is precisely that concern which our decision attempts to address. *Id.* at 242, 119 S. Ct. at 682. Finally, we note that *West Covina*, while citing *Mullane*, did not mention the "reasonably calculated" standard or apply it. *See West Covina*, 525 U.S. at 240, 119 S. Ct. at 681. Based on the Court's endorsement of the *Mullane* standard in *Dusenbery v. United States*, 534 U.S. 161, 122 S. Ct. 694 (2002), three years after the decision in *West Covina*, we believe that our "reasonably calculated" analysis is not controlled by the Court's decision in *West Covina.*

In conclusion, we hold that when the tenants of Lafayette Square were evicted from their leasehold interests based on exigent circumstances and were given less than thirty-six hours to vacate the premises, they were entitled under *Mathews* and *Mullane* to affirmative, contemporaneous notice of their right to challenge the condemnation order but they were not entitled to a pre-deprivation hearing. By "affirmative" notice, we mean that they were entitled to notice above and beyond that

provided by § 30A.11 of the City Code. By "contemporaneous" notice, we mean that they were entitled to notice of their right to challenge the condemnation at the same time they were provided with the notice to vacate the premises.

B.     *Was the tenants' right clearly established at the time of eviction?*

Because the facts alleged by the plaintiffs show that Rhodes' conduct violated the plaintiffs' due process rights under the Fourteenth Amendment, we now turn to the second *Saucier* inquiry and ask whether the law at the time of eviction made clear to a reasonable code enforcement officer that Rhodes' conduct was unlawful. We conclude that a reasonable code enforcement officer could have believed that Rhodes' conduct was lawful, and therefore Rhodes was entitled to qualified immunity. In the simplest terms, this decision is compelled by *West Covina*. In light of the Supreme Court's decision in *West Covina*, a reasonable code enforcement officer could readily have concluded that Rhodes was under no obligation to provide notice, pre-deprivation or otherwise, of the tenants' right to challenge the condemnation decision because the remedial procedure available to the tenants was established by a published, generally available source, § 30A.11 of the City Code.

The plaintiffs make several arguments to support the claim that their right to notice was clearly established. They cite *Memphis Light* for the proposition that Rhodes had an affirmative obligation at the time of eviction to inform the tenants of

their right to challenge the condemnation decision, but we addressed and rejected this argument, based on *West Covina*, in Part A. They also rely on *Fuentes v. Shevin*, 407 U.S. 67, 92 S. Ct. 1983 (1972), and *Barry v. Barchi*, 443 U.S. 55, 99 S. Ct. 2642 (1979), to contend that they were at least entitled to immediate post-deprivation notice of their right to contest the condemnation. This might very well be true, but these decisions have no bearing on the fact that, under *West Covina*, a reasonable code enforcement officer could believe that § 30A.11 of the City Code provided the tenants with constitutionally-adequate notice *prior to the deprivation* and thus complied with *Fuentes* and *Barry*.

Finally, the plaintiffs point us to *Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994), a Sixth Circuit decision that addressed procedural due process requirements in the context of an emergency eviction. Obviously, a Sixth Circuit decision cannot clearly establish the law in this circuit. *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc). The plaintiffs acknowledge that *Flatford* cannot establish the law, but they argue that *Flatford* is "persuasive" because the Sixth Circuit's reasoning in *Flatford* was based entirely on the Supreme Court's opinions in *Fuentes* and *Mathews*. We reject the plaintiffs' reliance on *Flatford*. Although *Flatford* dealt with due process in the context of an exigent circumstances eviction, that decision did not consider how statutory notice might affect the

obligations of a code enforcement officer under the Constitution. The Supreme Court decisions upon which the plaintiffs contend *Flatford* relies do not address the effect of statutory notice either. In fact, the *Flatford* decision predated the Supreme Court's decision in *West Covina* by five years, and as a consequence, the Sixth Circuit's decision in 1994 does not disturb our conclusion that a reasonable code enforcement official could conclude, based on *West Covina*, that the City Code on its own provided constitutionally-adequate notice of the tenants' right to challenge the condemnation decision.

The dissent suggests that Rhodes should have known that any appeal brought by the tenants under § 30A.11 would have been futile. We disagree, and we explain our reasoning in some detail. Under the Orlando City Code, the Board has the power to "[h]ear appeals of any person affected by a notice issued in connection with enforcement of . . . [the] Minimum Standards Code." Orlando, Fla. City Code § 5.06(7). Affected persons who wish to pursue an appeal before the Board are instructed to "explain the basis of the challenge to the administrative determination or act" in their notice of appeal. *Id.* Thus, § 5.06(7) contemplates that the Board can hear appeals challenging administrative determinations, and Rhodes' issuance of a notice to vacate triggers the right to such an appeal under § 30A.11. There is no

43

doubt then that the Orlando City Code, on its face, empowers the Board to consider the tenants' challenge to Rhodes' condemnation order.

But the dissent concludes that the Board does not have the power to review or to reverse Rhodes' unilateral condemnation decision notwithstanding the provisions of §§ 5.06 and 30A.11. In support of this conclusion, the dissent cites Fla. Stat. § 162.08, which states that code enforcement boards may (1) adopt rules for the conduct of their hearings, (2) subpoena alleged violators and witnesses, (3) subpoena evidence, (4) take testimony under oath, and (5) "[i]ssue orders having the force of law to command whatever steps are necessary to bring a violation into compliance." Fla. Stat. § 162.08. This statute, the dissent argues, does not authorize a code enforcement board to review or to reverse a city's condemnation decision. We believe this reading of § 162.08 may be too narrow.

The City Code is violated when individuals are permitted to occupy any premises or dwelling units that contain "major violations" of the Code. Orlando, Fla. City Code § 30A.21. Rhodes found that Lafayette Square contained major violations of the Code, and he concluded that condemnation was the only appropriate mechanism to ensure compliance with the Code. In bringing their appeal, the tenants merely asked the Board to reconsider whether condemnation was the appropriate measure to address the violations at Lafayette Square. If the Board ultimately were

to disagree with Rhodes' condemnation decision, it would appear that the Board would be called upon to issue an order that would command those steps (which would *not* include condemnation) that the Board deemed necessary to bring the violations at Lafayette Square into compliance. Such an order, while having the practical effect of reversing Rhodes' condemnation decision, would appear to fall squarely within the Board's power under Fla. Stat. § 162.08(5).

Thus, a fair argument could be made that the Board does have the power to review and to reverse Rhodes' condemnation decision. (Notably, § 162 of the Florida statutes does not appear to contemplate that a city code enforcement officer like Rhodes may be vested with the unilateral power to condemn a building. *See* Fla. Stat. § 162.06(4).) But the dissent's competing view is well-taken, and it might well be true that the Board lacks the power to review Rhodes' unilateral condemnation order under § 162.08. But that question is not before us today. Instead, we are called upon to decide whether an objectively reasonable officer should have known in June 2000 that an appeal under § 30A.11 would be futile. This is an easier question, we believe, and we decide it in Rhodes' favor. The City Code explicitly entitles the tenants to challenge Rhodes' administrative decision in an appeal. The Florida statute, by contrast, does not explicitly authorize a Board to review or to reverse Rhodes' decision, but it does empower the Board to issue an order having the force of law to

achieve compliance through whatever steps the Board deems necessary. In light of the clear right to an appeal established in the Orlando City Code and the possibility that the Board's exercise of review power falls within its statutory authority, it would not have been self-evident to an objectively reasonable officer in Rhodes' position that the explicit right of appeal established in the City Code is illusory.

In reaching the opposite conclusion, the dissent relies extensively on Rhodes' training and experience. But this training and experience could not come to his aid. Although Rhodes has substantial experience in city government, has specific training in due process, and has condemned over 400 buildings (including at least three apartment complexes), the Board had never been asked to review one of Rhodes' unilateral condemnation decisions pursuant to § 30A.11. The dissent admits as much, but inexplicably goes on to conclude that Rhodes' extensive experience could somehow have helped him predict the Board's interpretation of its powers.

The dissent also paints a stark, and quite inadequate, picture of the Board's understanding of its authority. Relying on the deposition testimony of the Board's chairman and select excerpts of testimony from the two Board hearings in this case, the dissent implies that the entire Board believed that it lacked the power to review or to reverse Rhodes' decision. This characterization of the Board's understanding is inaccurate.

The dissent states that the Board understood at the July 12 hearing that it could only make a determination regarding code compliance. This is true, but not because the Board lacked the power to review Rhodes' condemnation decision. The Board's power was limited to evaluating code compliance at the July 12 hearing because the Board was hearing Rhodes' case against the owner of Lafayette Square, not the tenants' appeal. Accordingly, the statement regarding the Board's limited power did not necessarily reflect its understanding of its authority to review Rhodes' order.

The dissent then suggests that the July 26 hearing was called as a courtesy, arranged for the sake of good manners, to allow the tenants a venting session to express their feelings. This statement implies that the Board understood, at that hearing, that it could not review or reverse the condemnation order. But the transcript of the hearing does not bear this out. At the hearing, a member of the Board asked the City Attorney to frame the issues that the Board needed to decide. The City Attorney testified, "This Board can have a hearing on whether it was – at least what I understood, whether it's appropriate for the people to have been required to move and whether they should be allowed to move back in . . . . Now, there may be other issues the tenants would like to present to this Board, but to me – I assume the thrust of this would be the City made a mistake in asking us to leave, the building was safe, let us go back." (Tr. of Board Hr'g of July 26, 2000, at 26.) This statement, made by

the City Attorney in direct response to the Board's inquiry about the nature of the hearing, clearly calls into question the dissent's suggestion that the Board's conduct at the July 26 hearing is indicative of its belief that it could not review Rhodes' decision.

Later in the hearing, Cato, on behalf of the plaintiffs, asked the City to reverse the condemnation decision and require reinspection of every apartment. This request prompted the Board chairman to ask, "[I]f we reverse the decision and the order what are we accomplishing?" (*Id.* at 49.) Another member of the Board stated, "[W]hat they're asking us to do is reverse our decision, which I, as one member, am not *willing* to do." (*Id.* at 52; emphasis added.) And another member said, "[I]f we reverse the decision and require the City to go out and inspect, can we still keep the order intact that nobody is allowed to move back into those properties?" (*Id.* at 54.) These questions hardly suggest that the Board was steadfast in its collective belief that it had no authority to reverse Rhodes' decision; on the contrary, several members of the Board appeared to have no qualms with reviewing the condemnation decision, although they expressed their belief that the condemnation decision was appropriate.

After Cato and the plaintiffs testified before the Board, one of the members of the Board suggested that the Board should not disturb the condemnation order, but should require the City to reinspect the units at Lafayette Square and then have the

48

Board reconsider the matter. The Board chairman responded that the Board could request, but could not require, the City to reinspect the apartments because the Board's "primary purpose" was to evaluate compliance with the Code. (*Id.* at 105.) Although this statement hints at the boundaries of the Board's power, the chairman did not suggest that the Board lacked the power to reverse the condemnation decision at that time. The July 26 hearing concluded with at least three members of the Board stating, on the record, that the condemnation decision was appropriate, and with two of the six members voting in favor of a motion that would have acknowledged the City's promise to reinspect the complex with an expert selected by the tenants.

In summary, we believe that the dissent oversimplifies this issue, and in doing so, fails to appreciate the genuine uncertainty that surrounded the Board's review power at the time Rhodes condemned the complex. This case represents the first time that the Board was called upon under § 30A.11 to review a unilateral condemnation order. To the extent that the City Code and the Florida statute conflict – which we do not decide today – it was impossible for Rhodes to know, even with his significant experience, how this conflict would be reconciled. The dissent observes that the Board "floundered" at the July 26 hearing; it would be more accurate to say that neither the Board nor the City Attorney suggested during either hearing that the Board lacked the power to reverse Rhodes' condemnation decision. This perceived

49

limitation on the Board's power was crystallized for the first time in the Board chairman's deposition testimony almost one year after Rhodes condemned the complex. Our review of the record indicates that it was not self-evident *to the Board* during the hearings that it lacked the authority to review Rhodes' condemnation order; thus, it is inappropriate to suggest that it would have been self-evident to a reasonable code enforcement officer several weeks earlier.

The plaintiffs have failed to demonstrate that a reasonable code enforcement officer would have believed that Rhodes' conduct was unlawful. At the time of eviction in June 2000, a reasonable code enforcement officer could reasonably have concluded, in light of *West Covina*, that § 30A.11 of the Orlando City Code, a publicly available document, placed the tenants on notice of their right to challenge Rhodes' condemnation decision.[20] Although we conclude in Part A that this case is

---

[20] In the dissent's view, *West Covina* "sails alone." But *West Covina* is not an aberrant decision from a prior era that has not been formally overruled. Nor is it a decision that clearly ignored relevant precedent in reaching a conclusion at odds with established law. Rather, *West Covina* is the most recent Supreme Court due process opinion that addresses the constitutional adequacy of statutory notice, and the *West Covina* Court, cognizant of its decision in *Memphis Light*, took care to reconcile its decision with *Memphis Light*. While the dissent characterizes *West Covina* as marginal and anomalous, such a characterization is premature. *West Covina* might prove to be marginal and anomalous, as the dissent suggests. Or, if *West Covina* represents the departure from prior law described by the dissent, it may signal the first step in a paradigm shift in due process jurisprudence. Or it might, as we suggest, reflect nothing more than the extension of the principle applied by the Supreme Court in *Reetz* almost a century ago. Only time will tell. But for the purposes of this appeal, the only time that matters is June 29, 2000, when Rhodes ordered the condemnation in this case. At that time, in light of the Supreme Court's recent decision in *West Covina*, a reasonable code enforcement officer could have believed that statutory notice was constitutionally sufficient.

distinguishable from *West Covina* and warrants a different outcome, we cannot say that a reasonable code enforcement officer would have believed in June 2000 that the law clearly entitled the plaintiffs to notice above and beyond that already provided in § 30A.11 of the City Code.

## IV. CONCLUSION

We hold that the district court erred when it concluded that Rhodes was not entitled to qualified immunity as to the plaintiffs' post-deprivation due process claims. Accordingly, we REVERSE the district court's order to the extent that it denied Rhodes' claim of qualified immunity.

REVERSED.

BIRCH, Circuit Judge, concurring in part and dissenting in part:

I wholeheartedly agree with the majority's conclusion that the tenants in this case have alleged a violation of their constitutional right to contemporaneous and personal notice of a right to appeal their evictions. I write separately because I disagree with its wholesale rejection of the Supreme Court's decision in Memphis Light, as well as the decision to grant qualified immunity.

The majority conclude that a government official could not have reasonably known that the summary condemnation of property and subsequent eviction of its residents without providing them personal notice of their right to challenge the decision was unconstitutional. A reasonable code enforcement officer, they argue, could have readily concluded that such notice was not required "because the remedial procedure available to the tenants was established by a published, generally available source, § 30A.11 of the City Code." Maj. Op. at ___. Section 30A.11 provides that "[a]ny person affected by any notice which has been issued in connection with the enforcement of any provision of this Code . . . may request and shall be granted a hearing on the matter before the Code Enforcement Board [("Board")]." Though facially appealing, the predicate for the majority's conclusion unravels upon closer inspection.

52

In simplest terms, the futility of any appeal afforded by § 30A.11 would have been self-evident to any reasonable code enforcement officer in Rhodes's position. It is clear that the Board has authority to condemn and vacate buildings. See Orlando, Fla., Code § 30A.42. The City Code does not, however, grant the Board authority to *reverse*, on appeal, an independent condemnation decision made by the City.[1] Notwithstanding § 30A.11, the Board's jurisdiction is limited to "affording the proper relief consistent with the powers granted by Florida Statute and by this Chapter." Id., § 5.05(g). The Florida legislature, however, only empowers local enforcement boards, in pertinent part, to "[i]ssue orders having the force of law to command whatever steps are necessary to bring a violation into compliance," Fla. Stat. Ann. § 162.08(5) (2003), and not, for example, to review a city's unilateral condemnation order.[2]

That limited jurisidiction is substantiated by the Board's own understanding of its role in the code enforcement process. As clarified by the testimony of its chairman, Mr. Kuritzky, the Board is limited to the adjudication of the property

---

[1] Such decisions are made pursuant to §§ 30A.42 ("Procedure for Vacating of Structures or Premises"), 30A.45 ("Procedure for Emergency City Action"), or 30A.38 ("Public Nuisances").

[2] Under § 5.08, "[a]n aggrieved party . . . may appeal a final administrative order of the [Board] to the Circuit Court." Obviously, if the Board has no authority to reverse a city's condemnation decision, there is nothing to challenge on appeal. In addition, § 5.08 uses the term "party" instead of "person affected," as § 30A.11 does. While evicted tenants are certainly affected by a condemnation decision, they are not an "aggrieved party." See Kuritzky Dep. 29:13-15.

owner's guilt or innocence on alleged code violations, and has no authority to reverse a city official's condemnation order. There is simply no way for an evicted tenant to challenge such an order through Board action.[3] As such, the Board has no obligation to hear from evicted tenants, and the hearing provided to the tenants in this case was a mere "courtesy." The Board's own conduct during those hearings suggests as much. When some of the tenants petitioned the Board to defer its ruling at the first scheduled hearing until all tenants were given an opportunity to speak Mr. Kuritzky told them that the Board could "only make a determination whether or not the property is or is not in compliance with the code." 12 July Hr'g Tr. at 49:21-25. At the second hearing called, Mr. Kuritzky again stated "all [the Board] can do is determine if there is non-compliance." 26 July Hr'g Tr. at 46:12-13. In fact, the second hearing was called, not to take action, but merely for the sake of good manners, "to allow the tenants . . . to express their feelings and observations," Id. at 3:15-19. Board members floundered at this meeting, finding it difficult to comprehend what relief could be afforded or even what the issue before them was. A venting session is no substitute for a meaningful opportunity to be heard, something the tenants were never afforded in this case. Without effective review, the

---

[3] Likewise, the City provides no appeals process to review its own condemnation decisions. Grandin Dep. 18:1-3 (City of Orlando, Director of Planning and Development).

54

City's summary condemnation order was *de jure* final and unappealable, and therefore constitutionally inadequate. In turn, statutory notice of the Board's impotence in this regard is similarly unsatisfactory, for notice of an ineffectual opportunity to be heard is no notice at all.

Rhodes must have known this, as any code enforcement officer with his training and experience would have. At the time of the eviction notices, he had substantial experience at high levels of city government, and specific training in the mandates of due process. He was Chief of the Code Enforcement Bureau, and the official to whom the City delegated the important responsibility of declaring dangerous structures uninhabitable. Over the years serving as the chief executive officer of his division, he had condemned over 400 buildings. Indeed, he testified in his deposition that he does not "ordinarily seek a condemnation order from the [B]oard," Rhodes Dep. 122:7-8, that in the three prior apartment condemnation cases, the Board never reviewed his condemnation decisions, and that such a decision becomes a Board case only "[w]hen the property owner fails to comply with the original compliance schedule." Rhodes Dep. 77:20-78:2. That the highest official in a city's building safety department could have reasonably concluded that statutory notice of a sterile opportunity to be heard was constitutionally sufficient stretches the imagination to an untenable degree. In light of these inferences, we should have

55

affirmed the denial of qualified immunity; at most, we should have remanded for fact finding on this issue.

Equally troubling is the majority's out-of-hand rejection of the principles and clear import of the holding articulated by the Supreme Court in Memphis Light. It is beyond question that the constitutional right to notice and an opportunity to be heard before a person is finally deprived of property by government action is clearly established. Mullane, 339 U.S. at 313, 70 S. Ct. at 656-57. Without relying on Memphis Light, however, the majority distill a further due process requirement: "[w]hen exigent circumstances prompt an emergency eviction, contemporaneous pre-deprivation notice is required," such that "tenants must receive notice of their right to challenge the condemnation decision when they are provided with the notice to vacate the building." Maj. Op. at ___. In doing so, they distinguish the questions whether and when such notice must be provided, from the *method* of delivering that notice, whether it be statutory or personal.

The general right to contemporaneous notice was articulated in Memphis Light with such clarity that a reasonable official would have realized that the tenants here were entitled to this type of notice. After all, if the rule applies to basic necessities in the home such as utilities, a fortiori, it clearly applies to the right to occupy a home in the first place. At a minimum, then, Memphis Light clearly establishes that

56

*contemporaneous* notice of the right to appeal is constitutionally required before tenants may be evicted from their homes without warning.[4]

_____

[4] Cases from other circuits also make this proposition abundantly clear. It is true that thus far we look only to our own precedent and the decisions of the United States Supreme Court and the supreme court of the relevant state in this Circuit to determine whether law is clearly established. See Marsh v. Butler County, Ala., 268 F.3d 1014, 1031 n.9 (11th Cir. 2001) (en banc). Language in a number of fairly recent Supreme Court opinions, however, has signaled a different approach. See, e.g., Hope, 536 U.S. at 747 n.13, 122 S. Ct. at 2519 n.13 (2002) (noting in its qualified immunity analysis that there were "apparently no decisions on similar facts from other Circuits"); Wilson v. Layne, 526 U.S. 603, 617, 119 S. Ct. 1692, 1700 (1999) (refusing to find that "the law on third-party entry into homes" was clearly established, in part because no cases either in the relevant jurisdiction *or* from "a consensus of cases of persuasive authority" had been presented); United States v. Lanier, 520 U.S. 259, 269, 117 S. Ct. 1219, 1226-27 (1997) (observing that, although "disparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered, such a circumstance may be taken into account in deciding whether the warning [to government officials] is fair enough"); Id. at 269, 117 S. Ct. at 1226 (stating that when "applying the rule of qualified immunity," the Court has "referred to decisions of the *Courts* of Appeals when enquiring whether a right was 'clearly established'") (emphasis added); Elder v. Holloway, 510 U.S. 510, 516, 114 S. Ct. 1019, 1023 (1994) (counseling a lower court to "use its 'full knowledge of its own [*and other relevant*] precedents'" in a qualified immunity analysis) (alteration in original) (emphasis added) (citation omitted); Anderson v. Creighton, 483 U.S. 635, 646, 107 S. Ct. 3034, 3042 (1987) (referring to "current *American* law" when describing reasonableness for qualified immunity purposes) (emphasis added).

Under "current American law," the rule in Memphis Light is unmistakable. Sister courts have held that those summarily evicted through condemnation procedures are entitled to contemporaneous notice of their right to appeal. See, e.g., Flatford v. City of Monroe, 17 F.3d 162, 169 (6th Cir. 1994); McGee v. Bauer, 956 F.2d 730, 737-38 (7th Cir. 1992); Wilson v. Health & Hosp. Corp., 620 F.2d 1201, 1214-15 (7th Cir. 1980) ("hav[ing] little difficulty in finding that Mullane and the due process clause require personal notice of the individual's right to a hearing prior to the government's depriving the individual of any property interest, notwithstanding the 'notice' provided by the public character of the ordinance itself. . . . [W]e do not believe it is adequate for the government simply to rely upon the time worn adage that 'ignorance of the law is no excuse.'").

Persons deprived of other forms of property are also frequently entitled to such notice. For cases requiring notice of the right to appeal a denial of statutory benefits, see, e.g., Sullivan v. Barnett, 139 F.3d 158, 173 (3d Cir. 1998), rev'd on other grounds, 526 U.S. 40 (1999) (suspension of employee medical benefits); Davis v. Mansfield Metro. Hous. Auth., 751 F.2d 180, 185 (6th Cir. 1984) (denial of eligibility for Section 8 housing program); Holbrook v. Pitt, 643 F.2d 1261, 1280-81 (7th Cir. 1981) (denial of retroactive housing assistance payments); Bliek v. Palmer, 102 F.3d 1472,

But the majority also reject Memphis Light as clearly establishing that *personal* notice of such a right is also compelled by due process, and this is the basis for their decision to grant qualified immunity. For support, they refer to the Supreme Court's recent conclusion that owners of property seized in the course of a criminal investigation have no constitutional right to "individualized notice of state-law remedies" to contest the seizure, or procedures to petition for the return of property, if those remedies and procedures "are established by published, generally available state statutes and case law." West Covina, 525 U.S. at 241, 119 S. Ct. at 682. The Court distinguished Memphis Light because "the administrative procedures at issue [there] were not described in any publicly available document." Id. at 242, 119 S. Ct. at 682.[5]

---

1476 (8th Cir. 1997) (reduction of food stamp benefits to cover prior overissuances); Gonzalez v. Sullivan, 914 F.2d 1197, 1203 (9th Cir. 1990) (denial of disability benefits); Jordan v. Benefits Review Bd. of the U.S. Dep't of Labor, 876 F.2d 1455, 1459-60 (11th Cir. 1989) (denial of black lung benefits). For cases requiring notice of possible exemptions to postjudgment seizures and the procedures for claiming them, see, e.g., Dionne v. Bouley, 757 F.2d 1344, 1352 (1st Cir. 1985); McCahey v. L.P. Investors, 774 F.2d 543, 549 (2d Cir. 1985); Finberg v. Sullivan, 634 F.2d 50, 62 (3d Cir. 1980); Cinea v. Certo, 84 F.3d 117, 122 (3d Cir. 1996); Reigh v. Schleigh, 784 F.2d 1191, 1196 (4th Cir. 1986); Aacen v. San Juan County Sheriff's Dep't, 944 F.2d 691, 699 (10th Cir. 1991). For cases requiring notice of the right to challenge other types of seizures, see, e.g., Anderson v. White, 888 F.2d 985, 992 (3d Cir. 1989) (interception of federal tax refunds to cover child support delinquencies); DiCesare v. Stuart, 12 F.3d 973, 978 (10th Cir. 1993) (seizure of sick horses by county official); but see Ramirez-Osorio v. INS, 745 F.2d 937, 945-46 (5th Cir. 1984) (Due process does not require blanket notice by the INS to deportable detainees of the right to seek asylum.).

[5] The distinction's legitimacy is hardly indisputable. The Court in Memphis Light did note that "the opportunity to invoke [a dispute resolution] procedure, if it existed at all, depended on the vagaries of 'word of mouth referral.'" 436 U.S. at 14 n.14, 98 S. Ct. at 1563 n.14. It did so,

Seizing upon this questionable distinction, my esteemed colleagues view <u>West Covina</u> as the culmination of a century-old line of cases standing for the proposition that "a publicly available statute may be sufficient to provide . . . notice because individuals are presumptively charged with knowledge of such a statute." Maj. Op. at ___. This, they argue, "provides the basis for a compelling argument that § 30A.11 of the Orlando City Code, standing alone, provides [sufficient] notice to the tenants of their right to challenge the condemnation order and thus satisfies due process." Maj. Op. at ___.

The argument creates only the illusion of consistency, however. The cases cited by the majority exclusively address self-executing statutes of limitations on abandoned claims, or other generally applicable legislative enactments. They do not

---

however, in the course of determining whether the plaintiffs had actual notice of those procedures. <u>Id.</u> at 13-14, 98 S. Ct. at 1562-63. That threshold finding was important because "the Due Process Clause does not require notice where those claiming an entitlement to notice already knew the matters of which they might be notified." <u>Moreau v. Fed. Energy Regulatory Comm'n</u>, 982 F.2d 556, 569 (D.C. Cir. 1993); <u>accord</u> <u>EEOC v. Pan American World Airways, Inc.</u>, 897 F.2d 1499, 1508 (9th Cir. 1990) ("Actual knowledge of the pendency of an action removes any due process concerns about notice of the litigation."); <u>Crocker v. Fluvanna County Va. Bd. of Pub. Welfare</u>, 859 F.2d 14, 16 (4th Cir. 1988) (concluding that failure of a government employer to inform discharged employee of grievance rights where employee had actual knowledge of them did not violate due process); <u>cf.</u> <u>Codd v. Velger</u>, 429 U.S. 624, 627-28, 97 S. Ct. 882, 884 (1977) (holding that a name-clearing hearing, ordinarily required for an employee stigmatized by discharge, is not required where the employee "does not challenge the substantial truth of the material in question"). Had there been actual notice, the Court would not have needed to decide whether the notice provided was constitutionally inadequate. The distinction in <u>Memphis Light</u> therefore had nothing to do with the subsequent determination that the utility company had, in fact, violated the Due Process Clause.

59

address deprivations triggered by specific, individualized state action such as the

condemnation order in this case.[6] The distinction is made even clearer in <u>Texaco</u>:

> [A] series of cases . . . have required specific notice . . . before a driver's license is suspended for failure to post security after an accident, before property is seized pursuant to a prejudgment replevin order, or before service is terminated by a public utility for failure to tender payment of amounts due [<u>Memphis Light</u>]. In each of those cases, however, the property interest was taken only after a specific determination that the deprivation was proper. In the instant case, the State of Indiana has enacted a *rule of law uniformly affecting all citizens* that establishes the circumstances in which a property interest will lapse through the inaction of its owner.

---

[6] <u>See, e.g.</u>, <u>Atkins</u>, 472 U.S. at 129, 105 S. Ct. at 2528-29 (concluding that a *congressional* modification to the food-stamp program is not subject to procedural due process because it "does not concern the procedural fairness of individual eligibility determinations[, but r]ather . . . involves a *legislatively mandated* substantive change in the scope of the entire program") (emphasis added); <u>Locke</u>, 471 U.S. at 108, 105 S. Ct. at 1799-1800 (upholding a federal statute because it adequately notified claimants of actions necessary to avoid abandonment of a mining claim. "In altering substantive rights through enactment of *rules of general applicability*, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and . . . affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements.") (emphasis added); <u>Texaco</u>, 454 U.S. at 523, 538, 102 S. Ct. at 789, 797 (upholding statutory return of abandoned mineral interests to the owner of the surface rights without prior notice and opportunity to be heard); <u>Anderson Nat'l Bank v. Luckett</u>, 321 U.S. 233, 241, 243-44, 64 S. Ct. 599, 604-05 (1944) (upholding statute requiring banks to transfer funds from all inactive and unclaimed deposits to the state without personal notice to depositors); <u>North Laramie Land Co.</u>, 268 U.S. at 283, 45 S. Ct. at 494 (upholding statutory notice of time to file objections to, and a claim for damages from, a *legislative* decision by a board of county commissioners to construct a new road in part because "[s]uch statutes are *universally* in force and are *general in their application*") (emphases added); <u>Reetz</u>, 188 U.S. at 509, 23 S. Ct. at 392 (upholding as sufficient notice a "statute fix[ing] the time and place of meeting of" a board of registration at which an applicant to practice medicine could have requested an *ex ante* hearing *prior to* any board action on the application, but not addressing in any way the statute's failure to afford notice of an applicant's right to challenge *ex post* the board's decision in any given case).

454 U.S. at 536-37, 102 S. Ct. at 796 (footnotes omitted) (emphasis added). Thus, where a deprivation is not the result of an individualized judicial or quasi-judicial determination, "[t]he Due Process Clause does not require a defendant to notify a potential plaintiff that a statute of limitations is about to run." Id. at 536, 102 S. Ct. at 796. "The words 'after notice and . . . hearing' . . . connote a hearing appropriate to adjudicatory action, not to legislation or rule making." Philadelphia Co. v. S.E.C., 175 F.2d 808, 818 (D.C. Cir. 1948), vacated as moot, 337 U.S. 901, 69 S. Ct. 1047 (1949) (mem.). In short, "a self-executing statute of limitations is [not] unconstitutional." Texaco, 454 U.S. at 536, 102 S. Ct. at 796.

However, like the seizure in West Covina, the condemnation order here was not self-executing by virtue of the tenants's failure to act. It was not the result of a "rule of law uniformly affecting all citizens." Id. at 537, 102 S. Ct. at 796. It arose instead from an individualized, specific, and quasi-judicial agency determination by Rhodes that the living conditions of the condemned dwellings were dangerous to human health and potentially life-threatening. West Covina and the case here, therefore, sit uneasily with the statute-of-limitations-cases on which the majority rely. Instead, they fall more comfortably under the rubric that personal notice is required where a deprivation is triggered by some case-specific government action.

61

This fundamental requirement was clearly enunciated over fifty years ago in Mullane. The statute there authorized the establishment of common trust funds and provided "for accountings twelve to fifteen months after the establishment of a fund and triennially thereafter." Mullane, 339 U.S. at 308-09, 70 S. Ct. at 654-55. Thus, the beneficiaries of the trust, like "[t]he tenants in this case, . . . could have turned to [the statute] to learn of their right[s]," Maj. Op. at ___, concerning the impending judicial settlement of their trust accounts. Yet, the Court deemed this minimalist approach incompatible with due process. 339 U.S. at 320, 70 S. Ct. at 660. The Court held that, for those beneficiaries whose individual whereabouts were known, personal notice was required. 339 U.S. at 318, 70 S. Ct. at 659.

> [W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it . . . , [and], where conditions do not reasonably permit such notice, . . . the form chosen [must] not [be] substantially less likely to bring home notice than other of the feasible and customary substitutes.

Id. at 315, 70 S. Ct. at 657-58. "Certainly sending [the beneficiaries] a copy of the statute months and perhaps years in advance does not answer this purpose." Id. at 318, 70 S. Ct. at 659. If mailing the statute is insufficient, then obviously notice under the statute itself, without more, also shrinks under the unwavering gaze of due process scrutiny.

A little more than a decade later in Schroeder v. City of New York, 371 U.S. 208, 83 S. Ct. 279 (1962), the Court applied Mullane to a nonclaim statute of limitations and found statutory notice wanting. The statute in that case authorized government acquisition and diversion of certain river waters. It required notice by publication and posting only, and provided a three-year limitations period within which a property owner could claim damages from the diversion. Id. at 209-10, 83 S. Ct. at 280-81. "Neither the newspaper publications nor the posted notices explained what action a property owner might take to recover for damages caused by the city's acquisition, nor did they intimate any time limit upon the filing of a claim by an affected property owner." Id. at 210, 83 S. Ct. at 281.

The Court rejected these forms of notice, acknowledging "[t]he general rule that emerges from the Mullane case . . . that notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." Id. at 212-13, 83 S. Ct. at 282. Even if the property owner had constructive notice, the Court said, it "is far short of notice . . . that the appellant had a right to be heard on a claim for compensation for damages . . . . That was the information which the city was constitutionally obliged to make at least a good faith

effort to give *personally* to the" property owner.  Id. at 213-14, 83 S. Ct. at 283 (emphasis added) (footnote omitted).

The ensuing decisions in Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 108 S. Ct. 1340 (1988), and Mennonite Board of Missions v. Adams, 462 U.S. 791, 103 S. Ct. 2706 (1983), are also instructive.  In Mennonite, the Court held that due process requires personal notice to the recorded mortgagee of a proceeding to sell secured property at public auction for nonpayment of taxes.  462 U.S. at 798, 103 S. Ct. at 2711.  The statute at issue explained the procedures for holding the tax sale, as well as the procedures by which the mortgagee could redeem the property within two years of the sale.  In rejecting the statutory notice provisions, the Court stated that it "ha[d] adhered unwaiveringly to the principle announced in *Mullane*."  Id. at 797, 103 S. Ct. at 2710-11 (citing, *inter alia*, Memphis Light, 436 U.S. at 13-15, 98 S. Ct. at 1562-63).  Noting that the case was "controlled by the analysis in *Mullane*," the Court articulated the applicable standard:  "Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable."  Id. at 798, 800, 103 S. Ct. at 2711, 2712.

At issue in Tulsa was another nonclaim statute extinguishing all creditor claims against an estate if they were not brought within two months of the commencement of probate proceedings. The statute provided for notice through publication only. Id. at 479, 108 S. Ct. at 1342. In holding that the statute violated the creditors's due process rights, the Supreme Court acknowledged that "the State's involvement in the mere running of a general statute of limitations generally [is in]sufficient to implicate due process." Id. at 485-86, 108 S. Ct. at 1345. Yet, it found that the probate court's "involvement [in triggering the limitations period wa]s so pervasive and substantial that it must be considered state action," id. at 487, 108 S. Ct. at 1346, in contrast to the "'self-executing feature' of a statute of limitations." Id. at 486, 108 S. Ct. at 1345. As such, due process rights applied, and where a creditor was "known or 'reasonably ascertainable,'" personal notice by mail was required. Id. at 488, 491, 108 S. Ct. at 1346, 1348 (citing Mennonite and Memphis Light).

There is a common thread running through all these cases. With limited exceptions such as abandonment, impossibility, or other measures likely to impart actual notice, personal notice is required when a deprivation is threatened by specific state action in individual cases. Notice by statute under these circumstances is inadequate, even if, at first glance, it appears to be a nonclaim statute of limitations. The principle applies with substantial force where a summary deprivation has already

65

occurred, or there is a high risk of an erroneous determination and the cost of notifying interested parties is relatively low. "[P]articularly extensive efforts to provide notice may often be required when the State is aware of a party's inexperience or incompetence." Mennonite, 462 U.S. at 799, 103 S. Ct. at 2712 (citing Memphis Light, 436 U.S. at 13-15, 98 S. Ct. at 1562-64).[7]

The decision in West Covina sails alone in these waters. It floats adrift from any legal flotilla, tethered neither to the rule of personal notice forged in Mullane, Schroeder, Memphis Light, Mennonite, and Tulsa, nor to the principle developed in Reetz and its progeny exempting laws of general applicability from the dictates of due process. This alienation is explained by the notable differences between it and other due process cases. For example, the Court found it important in West Covina that "neither the Federal Government nor any State requires officers to provide individualized notice of the procedures for seeking return of seized property." 525

---

[7] As the majority point out, whether the content of the notice at issue is the right to challenge a deprivation or the potential deprivation itself "makes no difference." Maj. Op. at ___. Just as the opportunity to *defend* substantial rights and interests that are to be adjudicated in an impending hearing is wasted if the defendant is not made aware of it, so is the opportunity to *challenge* a deprivation if the challenger is unaware of the ability, and the procedures by which, to do so. In this respect, due process applies whether adjudication is used as a sword or a shield. See Tulsa, 485 U.S. at 488, 108 S. Ct. at 1346 (observing that whether "notice [of an impending probate court proceeding] seeks only to advise creditors that they may become parties rather than that they are parties [is irrelevant], for if they do not participate in the . . . proceedings, the nonclaim statute terminates their property interests."); Boddie v. Connecticut, 401 U.S. 371, 376-77, 91 S. Ct. 780, 785 (1971) (noting that "[r]esort to the judicial process by . . . plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court.").

U.S. at 242-43, 119 S. Ct. at 682. By contrast, the vast majority of circuits have held that persons deprived of property through civil government action are entitled to personal notice of their right to appeal the deprivation.[8] The distinctions between the condemnation order of an administrative officer in the context of a civil code violation and the seizure of property by police grappling with the inherent exigencies of a criminal homicide investigation are stark indeed. Moreover, the sense of urgency and confusion associated with the permanent and irretrievable loss of a person's home, land or other basic necessity, and the cardinal importance of intelligible procedures designed to prevent unwarranted deprivations, did not exist in West Covina. See 525 U.S. at 236, 119 S. Ct. at 679 (stating that the police seized mainly small items of personal property including guns, ammunition and some cash). Finally, there is no indication in that opinion that a failure by the property owners to activate their state-law remedies would have resulted in a permanent deprivation of the property seized as in these other cases.

In fact, the holding in West Covina applies only to the narrow context of a search and seizure performed during routine criminal law enforcement. The decision therefore restricts due process principles only insofar as it rejects a "general rule that notice of remedies and procedures is required" for every deprivation. Id. at 242, 119

_____

[8] For case holdings, see infra note 4.

S. Ct. at 682. We advance no such rule. Instead, we conclude the opposite: the entitlement to such notice is not necessarily foreclosed merely because the remedies and procedures are delineated in statutory form. See Maj. Op. at ___. As my colleagues express so effectively, "[t]he law does not entertain the legal fiction that every individual has achieved a state of legal omniscience," or that every citizen "know[s] all of the law all of the time." Maj. Op. at ___. Indeed, low-income tenants evicted from their homes without prior notice cannot be charged with knowledge of narrow statutory procedures buried deep within city ordinances; under those circumstances, they would have all the clarity of a byzantine cathedral.

In light of these differences, West Covina did not muddy otherwise clear waters. Under the bright illumination of Supreme Court thought on due process and constitutionally sufficient notice, West Covina pales. By comparison, it is marginal and anomalous. A reasonable code enforcement officer with Rhodes's rank and experience would neither have been confused by it, nor would have relied on it.[9] Instead, a responsible government official, acting rationally, would have looked to the deeply ingrained case law springing from Mullane. The majority itself follow this path in concluding that Rhodes had an affirmative constitutional obligation to provide

---

[9] Interestingly, Rhodes failed to cite West Covina either to the district court or to us in his briefs.

68

tenants with contemporaneous *and personal* notice of their right to appeal his condemnation decision. In doing so, they rely on the notice standard in Mullane, as well as their "practical understanding of statutory notice": "the residents of Lafayette Square were provided with no more than thirty-six hours to vacate their homes, and during this limited period of time, they had to complete a multitude of tasks, which ranged from securing alternate shelter to collecting their personal belongings to making accommodations for work or school." Maj. Op. at ___. As such, they did not have a reasonable opportunity to educate themselves on the niceties of their, presumably efficacious, statutorily protected right of appeal. Maj. Op. at ___.

One could think that a high-ranking government official like Rhodes, who had condemned over 400 buildings, would have understood this. Yet, somehow, the majority finds this unclear.[10]

> [S]ome broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set

---

[10] The majority opinion rejects the factors in Memphis Light: that "the notice is given to thousands of customers of various levels of education, experience, and resources" concerning a deprivation of basic necessities "the uninterrupted continuity of which is essential to health and safety." 436 U.S. at 14 n.15, 98 S. Ct. at 1563 n.15. Ironically, the exigencies identified by the majority in this case are important, in large part, because shelter is a basic necessity, the guarantee of which is diminished by the relative lack of "education, experience, and resources" at the tenants's disposal.

of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle.

Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002) (citation omitted). "[I]n the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when the preexisting general constitutional rule applies 'with obvious clarity to the specific conduct in question.'" Id. at 1352 (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997)). Under Mullane, "X Conduct" is the case-specific civil deprivation of substantial property rights, permanently and irreversibly, without prior, personal notice "reasonably certain to inform those affected," whose identity and whereabouts are known, even in the case where the substance and frequency of the proceedings are published by statute and publicly promulgated. 339 U.S. at 315, 318-320, 70 S. Ct. at 657, 659-60. "X Conduct" is also what happened here: the drumhead condemnation of, and eviction from, house and home with minimal, and questionable, statutory notice that assaults the letter and spirit of the uncompromising demands in Mullane, Schroeder, Memphis Light, Mennonite, and Tulsa, all of which apply in this case with "obvious clarity." Rhodes is not entitled to qualified immunity.

In this regard, I respectfully dissent.